DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, William R. Simpson, appeals the judgment of the Summit County Court of Common Pleas finding him guilty of one count of grand theft, in violation of R.C. 2913.02(A)(3), and one count of offenses involving motor vehicle titles, in violation of R.C. 4505.19(B), and sentencing him to ten months imprisonment on each charge to be served concurrently. We affirm.
 I. {¶ 2} Mr. Simpson and the victim in this case, Michael Meden ("Meden"), had been friends for a number of years. Mr. Simpson owned and operated a car business in Garrettsville, Ohio. Meden previously purchased two vehicles from him. In 1997, Meden agreed to purchase a 1994 Viper from Mr. Simpson for either $52,500 or $53,500 — the terms of the actual sale and oral agreement are disputed.
 {¶ 3} Regardless of the details, Meden took almost immediate possession of the Viper, gave Mr. Simpson a cash down payment, disputed as to whether it was $2,000 or $7,000, and began paying him $970 per month for the car. The purpose, number, and location of monthly payments made by Meden to Mr. Simpson were disputed.
 {¶ 4} On November 13, 1998, Meden's bank issued a cashier's check in the amount of $36,718.34 to Mr. Simpson's bank. Notations on the check indicated that it was a payoff from Mr. Simpson for the loan on the Viper. The circumstances surrounding the submission of this check to Mr. Simpson are also disputed. What is not disputed, though, is that the check was issued for the exact amount necessary to pay off his original purchase loan on the Viper, and that he did use the check to completely pay off that loan.
 {¶ 5} At that point in time, Meden testified that he believed he had completely paid the purchase price for the Viper, and requested the title from Mr. Simpson. Mr. Simpson did not give Meden the title, and actually used the title for the car to secure a new $10,000 loan from his bank in December 1998 — the month after he used Meden's cashier's check to pay off the original loan.
 {¶ 6} Meden continued to drive the car without having the title. Mr. Simpson continued to renew the license tags and give them to Meden each year. Mr. Simpson stopped making payments on his $10,000 loan sometime during the summer of 2001. Due to the continued default, on April 25, 2002, his bank repossessed the Viper from Meden. Mr. Simpson did not return any money to Meden.
 {¶ 7} In May 2002, the Summit County Grand Jury indicted Mr. Simpson with one count of grand theft, in violation of R.C.2913.02(A)(3), and one count of offenses involving motor vehicle title, in violation of R.C. 4505.19(B). Mr. Simpson filed a motion to quash the indictment due to improper venue on January 23, 2003, the first day of the trial. During the trial, he made a Criminal Rule 29 motion for acquittal at the close of the State's evidence, which was renewed at the close of the case, and continued to challenge venue. The jury brought back a verdict convicting Mr. Simpson of both offenses and finding that the offenses occurred at least in part in Summit County. The trial court sentenced him to ten month terms of imprisonment on each count to run concurrently.
 {¶ 8} Mr. Simpson timely appeals his convictions, raising five assignments of error. For ease of discussion, we will discuss assignments of error two and three together, and assignment of error four out of order.
 II. First Assignment of Error
"The sentence was improper because the court relied on a probation violation for which [Mr. Simpson] did not receive a probation violation hearing."
 {¶ 9} In his first assignment of error, Mr. Simpson argues that the trial court improperly relied upon a probation violation for which he never received a hearing. We find his claim to be without merit.
 {¶ 10} First, Mr. Simpson admits that the probation violation is not on appeal. Second, he fails to cite to any law supporting his proposition. Mr. Simpson, as the appellant, has the burden of affirmatively demonstrating error on appeal. See Angle v.Western Reserve Mut. Ins. Co. (Sept. 16, 1998), 9th Dist. No. 2729-M; Frecska v. Frecska (Oct. 1, 1997), 9th Dist. No. 96CA0086. "If an argument exists that can support this assignment of error, it is not this court's duty to root it out." Cardonev. Cardone (May 6, 1998), 9th Dist. Nos. 18349 and 18673. We, therefore, refrain from addressing this assignment of error as Mr. Simpson has cited no supporting law. Accordingly, Mr. Simpson's first assignment of error is overruled.
 Second Assignment of Error
"[Mr. Simpson] was denied due process of law when he was convicted of offenses involving motor vehicle titles."
 Third Assignment of Error
"The conviction was against the manifest weight of the evidence with respect to R.C. 4505.19(B) and grand theft, R.C.2913.02(A)(3)."
 {¶ 11} In his second and third assignments of error, Mr. Simpson challenges the sufficiency of the evidence on his conviction for an offense involving a motor vehicle title, and also alleges that his convictions for both grand theft and an offense involving a motor vehicle title were against the manifest weight of the evidence. Specifically, Mr. Simpson asserts that the State failed to offer any evidence tending to show that he did not have the right to sell the motor vehicle.
 {¶ 12} Sufficiency of the evidence produced by the State and weight of the evidence adduced at trial are legally distinct issues. State v. Thompkins, 78 Ohio St.3d 380, 386,1997-Ohio-52. As to sufficiency, Crim.R. 29(A) states that a trial court "shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." However, if the record demonstrates that reasonable minds may reach differing conclusions as to the proof of material elements of a crime, a trial court may not grant a Crim.R. 29(A) motion for acquittal. State v. Smith, 9th Dist. No. 20885, 2002-Ohio-3034, at ¶ 7, citing State v. Wolfe
(1988), 51 Ohio App.3d 215, 216. "`In essence, sufficiency is a test of adequacy.'" Smith at ¶ 7, quoting Thompkins,78 Ohio St.3d at 386.
 {¶ 13} "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." State v.Gulley (Mar. 15, 2000), 9th Dist. No. 19600, citing Thompkins,78 Ohio St.3d at 390 (Cook, J., concurring). When a defendant maintains that his conviction is against the manifest weight of the evidence,
"an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986),33 Ohio App.3d 339, 340.
 {¶ 14} This power is to be invoked only in extraordinary circumstances where the evidence presented at trial weighs heavily in favor of a defendant. Id. A finding that a conviction is supported by the weight of the evidence, also includes a finding of sufficiency of the evidence. Smith at ¶ 9, quotingState v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462.
 {¶ 15} In this case, the jury convicted Mr. Simpson of grand theft and an offense involving a motor vehicle title. The grand theft statute reads:
"No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [b]y deception." R.C. 2913.02(A)(3).
R.C. 2913.01(A) defines "deception" as "knowingly deceiving another or causing another to be deceived by any false or misleading representation," and includes withholding information, preventing acquisition of information, or any conduct or lack thereof that "creates, confirms, or perpetuates a false impression in another" as to law, value, state of mind, or any other fact whether it is subjective or objective. A person "deprives" another when they withhold property, dispose of property so that the owner is unlikely to get it back, or take another's property intending not to "give proper consideration in return" for that property. R.C. 2913.01(C). A person is an "owner" if they have possession or control of property or if they have some license or interest in the property even though that possession, control, license, or interest is unlawful. R.C.2913.01(D). An individual has the requisite intent to commit grand theft if he intends to cause a specific result or "it is his specific intention to engage in conduct of that nature" regardless of what the actor intends to accomplish. R.C.2901.22(A).
 {¶ 16} R.C. 4505.19(B) defines offenses against a motor vehicle title.
"No person shall * * * [p]urport to sell or transfer a motor vehicle without delivering to the purchaser or transferee of it a certificate of title * * * assigned to the purchaser as provided for in this chapter, except as otherwise provided in this chapter[.]"
Under this statute, one "purport[s] to sell" when he gives "the appearance of selling an automobile [by implying he can legally transfer title] when a valid sale cannot in fact be made due to the transferor's lack of ownership." State v. Napier (July 20, 1992), 12th Dist. No. CA91-10-089. In other words, the State in this case must have shown that Mr. Simpson implied to Meden that he had the right to transfer ownership to the Viper, but that he could not legally do so under the circumstances.
 {¶ 17} Meden testified at length at trial. He indicated that he had known Mr. Simpson for about ten years. When Meden first met him, Mr. Simpson repaired and sold vehicles from a barn on his property. Meden purchased two other vehicles from Mr. Simpson over the years. Both previous deals had been "handshake deal[s]" and Meden promptly received title in both cases.
 {¶ 18} Then, sometime in the summer of 1997, Mr. Simpson drove by Meden's property with the Viper. After a quick test drive in the car, which Meden described as "a cross between a Corvette and a bat car," Meden agreed to purchase it for $52,500. At that time, Mr. Simpson wanted to drive the car for a few more months. He delivered the car to Meden in Summit County during the fall of 1997 along with all the vehicle registration, paperwork, keys, license, and tags. Per their prior arrangement, Meden made a down payment of $7,000 and began paying $970 per month towards the purchase price of the car. Meden intended to refinance one of his properties within a year and a half of receiving the car in order to pay off the remainder of the purchase price.
 {¶ 19} Similar to past deals made with Mr. Simpson, the men never reduced the agreement to writing. Meden, also, did not request a receipt for his down payment or any monthly payments made on the car. Meden vehemently disagreed with the suggestion that the $970 monthly payments were for a lease arrangement only, and that Mr. Simpson expected him to get a loan to finance the entire $52,500 purchase price above and beyond those monthly payments. Immediately after Mr. Simpson delivered the car, Meden began insuring the Viper with his insurance carrier. Meden also openly drove the car in the community and in parades.
 {¶ 20} Meden made the monthly $970 payments to Mr. Simpson for a little over a year, either by cash or check. The State introduced three checks for $970 made out to Mr. Simpson during that time period, and a fourth for $250, which Meden explained was only a partial payment, the rest being made in cash that month. On a few occasions, Meden would drive his vehicle to Mr. Simpson's home to deliver the payments, but, more often than not, Meden recalled that Mr. Simpson stopped by Meden's home in Summit County. Meden denied trying to pay him with other items, like a pinball machine, toy soldier molds, a coin collection, and a vintage collection of Playboy magazines, in lieu of the cash payments. Meden insisted that Mr. Simpson actually purchased the pinball machine, toy soldier molds, and some of the vintage Playboy magazines as separate, unrelated transactions.
 {¶ 21} Meden also disputed any allegation that he earned only $210 per week, regardless of his tax returns indicating that. The $210 weekly, he explained, was his base pay. He received additional pay outs from his business as well, enough to pay for the car.
 {¶ 22} In November of 1998, Meden refinanced his rental property specifically to pay off the remainder of the money owed to Mr. Simpson on the Viper. Meden's bank made out a cashier's check to Second National Bank in the amount of $36,718.34 — the exact payoff amount for the remaining purchase loan on the Viper that Mr. Simpson had at that bank. Meden asserted that "it was agreed on [between Mr. Simpson and Meden that] at the end of the payments when [Meden] refinanced [his] property that [Mr. Simpson] would call the bank and find out the exact payoff amount and then [Meden] would have a check made out to [Mr. Simpson's bank] to pay the loan off, and that would be the final payment for the car." As Meden's bank would not release the original check for trial, the State admitted a certified copy of the cashier's check into evidence at trial. The memo line of the check read "Payoff Number 117310 * * *, [Mr. Simpson]."
 {¶ 23} Meden stated that when he received the check, the cashier noticed that she had typed in the wrong date, November 12, and simply penciled in the correct date, November 13, over the incorrect date. Meden recalled that Mr. Simpson stopped by Meden's home in Norton to pick up the check the same day. Meden denied that he delivered the check to Mr. Simpson in Garrettsville.
 {¶ 24} In the spring of 1999, a few months after Meden made this payment, he began asking Mr. Simpson for the title to the Viper. Meden testified that Mr. Simpson merely gave Meden new tags for the license, and told Meden that he still had some paperwork to finish before he could give Meden the title. Each time Meden asked about the title, Mr. Simpson told him, "Well, there is some paperwork we got to straighten out." Regardless of the delay in getting the title, Meden also testified that, at that time, he did not think there was a problem, and that he had no reason to doubt Mr. Simpson's representations. Over the course of the next three and a half years, Meden continued to ask him for the title. Mr. Simpson never delivered the title. Mr. Simpson never asked for the car back.
 {¶ 25} In March 2000, Meden remembered telling Mr. Simpson that they "really needed to get this title thing cleared up [because Meden was] not comfortable driving on the dealer tags all the time." Meden offered to sell the car back to Mr. Simpson at that time, though they never actually agreed to any deal. Meden continued to ask for the title, and then "finally had enough" sometime in the winter of 2001. That winter, Meden tried to call Mr. Simpson multiple times, only to discover that Mr. Simpson's phone had been disconnected. Meden, therefore, drove to Garrettsville, where Mr. Simpson had lived since Meden bought the Viper, only to discover that Mr. Simpson's property was abandoned.
 {¶ 26} Meden then recalled that Mr. Simpson had relatives in Steubenville, and called information to try to find a number for Mr. Simpson. He discovered that Mr. Simpson had relocated his car business to Steubenville. Meden then called Mr. Simpson to try to either get the title to the Viper or resell it. Mr. Simpson told Meden that he needed to return to Garrettsville in order to straighten out the title.
 {¶ 27} In April 2002, after Meden left more messages with Mr. Simpson about the title, Mr. Simpson called Meden and admitted for the first time that "there might be a problem with the car; that a repo company was looking for it." Meden explained that Mr. Simpson finally admitted that he had used the car as collateral on an additional loan that Meden knew nothing about — a loan which Mr. Simpson applied for and received after Meden delivered the final cashier's check to him.
 {¶ 28} The next morning, Meden went to the police, and explained the entire situation to Lieutenant Thad Hete ("Lieutenant Hete"). Meden later discovered that Lieutenant Hete called Mr. Simpson to confront him with Meden's allegations. Meden also found out that, during that conversation, Mr. Simpson denied that Meden owned the car. Mr. Simpson apparently even threatened, in that same telephone call, to file unauthorized use charges against Meden.
 {¶ 29} Lieutenant Hete then called Meden to tell him about Mr. Simpson's allegations, and the threat of unauthorized use charges. When Meden heard about Mr. Simpson's threat, he returned to the police department. As he was leaving that second time, Meden received a call from Mr. Simpson on his cell phone. As circumstance had it, the police chief, who Meden knew, was walking out of the police station at the same time Meden received the call. Meden motioned to the police chief that he had Mr. Simpson on the phone. The police chief immediately got Lieutenant Hete, who told Meden to ask Mr. Simpson if Meden could call him back. Meden then called Mr. Simpson back from a telephone in the police station, and the entire call was taped. The State played the tape in court and admitted into evidence a transcript of the tape to aid in comprehension of some difficult to hear portions.
 {¶ 30} During the phone conversation, Meden expressed his worries about Mr. Simpson's bank repossessing the car over the additional loan, and Meden getting nothing for the $52,000 he paid for the car to Mr. Simpson. Mr. Simpson indicated that he intended to pay off the remainder of the loan as soon as he could, and blamed his sudden inability to make payments on the fact that his property in Garrettsville had been rezoned. The majority of his money at that time was "in cars[.]" Mr. Simpson stated that he had "twenty grand of receivables, probably ten grand in [his] pocket and thirty-five thousand on the ground, but that [was] all operating money." He continued by telling Meden that "what you don't understand is, right now, the only way to get out of all that * * * up there is the property. Once they change my zoning, that property ain't worth one third[.]"
 {¶ 31} Mr. Simpson then assured Meden that he would sign off on everything so that he could "just reclaim that loan and just walk in and pay it off." The call continued:
"Meden — Then I can get the title free and clear?
"[Mr.] Simpson — Sure.
"Meden — It ain't gonna cost me anything more, right?
"[Mr.] Simpson — No. Huh uh."
 {¶ 32} Mr. Simpson and Meden discussed the threat of repossession by the bank. Meden thought that an acquaintance of his and Mr. Simpson's, Timothy Suffles ("Suffles"), a person "of questionable character" according to Meden, was going to tell the bank the location of the Viper. Meden thought that Suffles and a friend wanted to buy the Viper from Mr. Simpson's bank after the repossession to make, as Mr. Simpson put it, a "quick grand apiece," and revenge some previous wrong Suffles felt he suffered at the hands of Mr. Simpson. When told about the threat of repossession, Meden replied that he "didn't know anything was going on." Meden later testified that he had never heard, until trial, that Suffles may have actually had the title to the vehicle and was attempting to repossess it for Mr. Simpson.
 {¶ 33} As the telephone conversation continued, Mr. Simpson reiterated that Meden could get served with repossession papers any minute, and that Meden would be left with nothing.
"[Mr.] Simpson — Legal way, you have no right as far as the court and everything involved, you would have no rights, okay.
"Meden — Even though I spent, whatever it was, fifty-two grand * * * The last thing I want to do is jam you up. All I want is my title, you know?
* * *
"[Mr.] Simpson — [W]hen they repo something, it goes right on the report. All the other creditors look at it and, you know, I mean, I don't want to throw away any money to places we don't have to. Then you are out, and I owe you. I don't really want to do that; do you know what I mean?"
 {¶ 34} When Meden tried to end the conversation, the following ensued:
"[Mr.] Simpson — What are you saying? Are you just going to sit and leave the situation the way it sits then [with people knowing where the car is to repossess it]?
"Meden — What choice do I have?
"[Mr.] Simpson — I think that is putting me at extreme risk to leave the car sitting there."
"Meden — Well, I could move it, but * * * are you telling me that you want to grab it and hide it?
"[Mr.] Simpson — Yeah, that's exactly what I'm saying."
 {¶ 35} Throughout the conversation, Meden continued to ask about what he could do, and whether he would get the title free and clear. He continually worried about ending up with neither the money he paid to Mr. Simpson or the Viper. Mr. Simpson replied that he did not have "that intent[,]" but that Meden did not have any legal rights and that it was Meden's problem. Mr. Simpson insisted that Meden did not need an attorney, as Mr. Simpson's attorney would handle both of their best interests, and that it would only take another 45 to 90 days to clear everything up if Mr. Simpson could hide the Viper in one of his garages for a while.
 {¶ 36} A few days later, Summit Towing repossessed the Viper from Meden. Meden never received any money back from Mr. Simpson. The Viper was never returned to him.
 {¶ 37} Gretchen Cram ("Cram"), the retail banking officer and manager for the Garrettsville branch of Mr. Simpson's bank, testified about the loans he secured with the Viper. While Cram's office did not make the original loan, Cram talked about the original security agreement and loan papers for Mr. Simpson's purchase of the Viper in September 1996. His original financing amounted to $50,838 with a $970.76 monthly payment. Cram pointed out the proper place on the loan papers for the VIN number of the Viper, and explained that the bank keeps the vehicle title in a secure collateral vault until the loan is paid off.
 {¶ 38} Cram then indicated that, after Mr. Simpson paid off the original loan, she personally dealt with him in December 1998 to make a second loan secured by the Viper. The new loan paperwork and security agreement, dated December 29, 2002, secured $10,000 with the Viper as collateral. Cram also pointed out a memorandum from the bank vice-president of the consumer loan department which gave the necessary specific approval for the loan — an additional protection in place by the bank given Mr. Simpson's low credit score and high debt to income ratio at that time.
 {¶ 39} When Mr. Simpson arrived at the bank to close the loan, Cram remembered that he had forgotten to bring the actual title with him. He had already given Cram a VIN for the paperwork, and tried to get the $10,000 check without giving Cram the title. Cram refused. He brought in the title the next day. Cram then realized that the VIN he had given her previously was off by one number. Before she had Mr. Simpson sign the paperwork, she had the old VIN marked out on the papers, and inserted the correct VIN. Cram denied that Mr. Simpson pointed out the mistake to her.
 {¶ 40} Bank records showed that Mr. Simpson made payments on the loan, plus additional payments on a credit card balance that the bank cross-collateralized with the loan, for three months. He then missed six months of payments before he began making consistently late payments on the account. Then, in October 2000, he stopped making any payments at all on the loan. Cram indicated that, at that point, the bank sent due notices to Mr. Simpson. Cram recalled her difficulty in reaching him by telephone, so she visited him at his Garrettsville dealership during the summer of 2001 in an effort to get him to make payments. When she visited Mr. Simpson's dealership and told him that the bank would repossess the Viper if he did not make payments, she specifically recalled Mr. Simpson's reaction:
"[Mr. Simpson] got very belligerent and he laughed and swore at [Cram] and said that [the bank] would never see the Viper because it was totaled. [He] had been racing it in Canada and that it was totally destroyed and it was in Canada.
"[Cram] asked him if he could give [her] the address where the car was located, and he said no and ordered [her] off the property."
 {¶ 41} Cram did not know at that time that Meden had the car. She believed Mr. Simpson's word that the car was totaled somewhere in Canada. Cram immediately turned that information over to the bank's collection department. Almost a year later, at the time the bank repossessed the car, Cram testified that Mr. Simpson still owed somewhere between $9,000 and $12,000 on the loan and cross-collateralized credit card debt, which included a substantial amount for late fees and attorney fees. At the time of trial, the bank still possessed the Viper.
 {¶ 42} Lieutenant Hete, a twenty-two year veteran of the Norton Police Department, testified next. The Lieutenant remembered Meden speaking to him about Mr. Simpson and the Viper in April 2002. After that initial conversation at the police station, Lieutenant Hete called Mr. Simpson at his car dealership, which had been relocated to Steubenville: "[T]he phone conversation didn't go very well. [Mr. Simpson] was uncooperative and started getting a little bit belligerent." Soon after the Lieutenant spoke with Mr. Simpson on the phone, he recalled that:
"[Meden] received a phone call while he was out in the parking lot on his cell phone. [The] chief of police happened to be coming in or going out at that time. [Meden] motioned to the chief of police that [Mr. Simpson] was on the phone, and somebody came in and got [Lieutenant Hete] and advised [him] of this."
 {¶ 43} The Lieutenant then explained that all but one line in the police station were taped, and so it was a simple matter to have Meden return the call to Mr. Simpson using a taped line. Lieutenant Hete agreed that the tape recording played earlier in trial, and its accompanying transcript, were accurate.
 {¶ 44} Two weeks later, after some additional investigation regarding the outstanding loan on the Viper, a local prosecutor with Barberton Municipal Court authorized charges. Lieutenant Hete executed the warrant for Mr. Simpson's arrest in May 2002.
 {¶ 45} Elizabeth Simpson ("Mrs. Simpson"), Mr. Simpson's wife of nineteen years, testified for Mr. Simpson. Mrs. Simpson helped Mr. Simpson with his car dealerships both in Garrettsville, and later in Steubenville, mostly working in the office or doing title work. She then testified that her husband picked up Meden in Norton so that Meden could get the Viper from their property in Garrettsville. She remembered seeing Meden leave their property driving the Viper. She insisted that Meden picked up the Viper in Portage County, and that her husband had not delivered it to Meden in Summit County.
 {¶ 46} Mrs. Simpson also talked about the visits Meden made to the Garrettsville dealership or to the house next to the dealership. She specifically recalled that Meden brought the $36,718.34 cashier's check to the dealership on a Thursday because a particular car auction occurred each Thursday. After the auction, she always made a deposit at the bank before 4:00 P.M. On that Thursday, November 12, 1998, when she returned from making the bank deposit, she saw Meden's truck at the dealership. When she entered the dealership, Mrs. Simpson saw the check on her husband's desk, and watched him put the check into his checkbook where they kept all checks for deposit. As the bank had already closed for the day, she asserted that Mr. Simpson deposited the check the next day — November 13, 1998.
 {¶ 47} Mrs. Simpson disputed Meden's assertion that she and her husband did not give receipts for payments made on cars. She testified that they would give each purchaser a receipt for any payments made on a vehicle. She also stated that she never took any payments from Meden for the Viper, and that her husband handled license plates and license plate tags for all the vehicles.
 {¶ 48} Mr. Simpson testified last. According to Mr. Simpson, he drove by Meden's house in September of 1996 and saw Meden outside. He pulled in to say hello, and Meden "went goo-goo over the car [and] tried to get [Mr. Simpson] to sell it. Purchase price wasn't even an issue." Mr. Simpson told Meden he was "not interested at all." He did, though, take Meden for a ride in the Viper. After that first drive, Mr. Simpson asserted that Meden would call him once a month and try to get Mr. Simpson to sell Meden the car. Mr. Simpson insisted, though, that he "didn't never paid much attention" because he "wasn't going to sell the car [as it was] something that you could not easily replace."
 {¶ 49} According to Mr. Simpson, it was not until July 1997 that he and Meden reached any agreement about the car. Meden called in early July and "happened to hit [Mr. Simpson] at the right time [because he] was kind of losing interest at that time [as he] just purchased a new boat[.]" He agreed to sell Meden the car for $53,500 plus tax and title, but stated that Meden wanted the car to drive immediately before Meden could secure financing. Therefore, Mr. Simpson demanded that Meden pay $1,000 monthly in order to drive the Viper, a type of lease, until Meden could secure the entire $53,500 in financing. Mr. Simpson indicated that Meden agreed to that arrangement, and that Meden implied he could get financing within 60 days.
 {¶ 50} Mr. Simpson testified that he picked up Meden later that day, and drove him to Garrettsville to get the Viper out of storage. Meden also gave Mr. Simpson a down payment of $2,000 that day. Meden said he might be able to get as much as $7,000 for the down payment depending upon his earnings as a fireworks exhibitor over the July 4th weekend, but Mr. Simpson denied receiving any more than $2,000 as a down payment.
 {¶ 51} In September 1997, after the agreed 60 days, Meden told Mr. Simpson he was having problems getting the financing. The bank would not approve the loan. Meden made his first monthly payment of $970, instead of the agreed $1,000, that same September. Mr. Simpson stated that the monthly payment was intended to secure the deal for another 30 days, and did not apply in any way to the purchase price agreed to by Meden. Over the next year, Mr. Simpson insisted that Meden made only three full and one partial monthly payment on the deal — only those payments evidenced by checks. Mr. Simpson did not press the issue during the winter months because the car could not really be driven in the snow and Meden had a better storage facility than Mr. Simpson. When the winter passed, Meden began making payments again. Mr. Simpson insisted that Meden delivered each of the payments to him at his dealership in Garrettsville.
 {¶ 52} Mr. Simpson also testified that Meden had difficulty finding the money to make the monthly payments. He talked about a number of other things that Meden tried to give him in lieu of the monthly payments: Indians tickets, a pinball machine, and molds for toy soldiers, all of which Mr. Simpson accepted for credit; He denied accepting an offered collection of vintage Playboy magazines. Also during this time, Mr. Simpson said he was "beating on [Meden] the whole time" about getting financing for the car. Meden told Mr. Simpson that "he's told everyone and his brother, showed it, and didn't want to give that up[.]"
 {¶ 53} Then, in September 1998, Mr. Simpson recalled wanting the Viper back in order to auction it, since Meden was neither making the agreed payments nor obtaining financing. "[Mr. Simpson] was looking at purchasing an aircraft. [The bank] said [he] could do it as long as [he] got this other 50 grand loan off, 970 a month. [He] needed [that] to go." Mr. Simpson testified that his debt to income ratio was too high at that point in time to finance the aircraft, partly due to the Viper loan, as well as some floor plan financing for his dealership, and his recent financing of $125,000 for a boat and $170,000 for some property. Mr. Simpson, therefore, told Meden many times that he wanted the car back.
 {¶ 54} On November 11, 1998, Mr. Simpson said that Meden called him to find out if he would be available the next day. Mr. Simpson told Meden that he would be at a car auction on the 12th, a Thursday, so that he would be unavailable. Meden suddenly sounded "disenchanted[,]" until Mr. Simpson said he would return by two. "Oh, okay. [Meden] says, `I got a check', end of conversation." Mr. Simpson denied getting the pay off amount for the current Viper loan for Meden or Meden's bank. Mr. Simpson also denied knowing that Meden had refinanced his property and would be bringing by the cashier's check to pay off the loan.
 {¶ 55} Mr. Simpson remembered Meden arriving at the Garrettsville dealership a little before 4 P.M. on November 12, 1998.
"[Meden] came in and, you know, he throws the check down, and he kind of looked at it.
"[Mr. Simpson] said, `Well, what's that?'
"[Meden] said, `Well, you know, I could get this much on my property and then, you know, we will get the rest on the title.'"
Mrs. Simpson walked in about that point, and no more conversation ensued. Mr. Simpson placed the check in a drawer where he kept all the deposits, and then deposited the cashier's check the next day.
 {¶ 56} Mr. Simpson believed that the cashier's check was only a partial payment for the Viper, and expected Meden to finance the remainder. He denied that the check was meant to pay off his purchase loan for the Viper. He said that the odd check amount, $36,718.34, was simply the total amount that Meden could get from refinancing his property. He did not remember seeing the pay off notation and loan number in the remitter line. Mr. Simpson also vehemently denied that he could have picked up the cashier's check at Meden's house on November 13, 1998, because the deposit receipt was time and date stamped: 14:11, November 13, 1998. He also said that he had some difficulty depositing the check due to the date alteration, but that the bank accepted the check after a series of phone calls.
 {¶ 57} At that point in time, Mr. Simpson did not know the pay off amount for his loan, but indicated that he "remember[ed] receiving the title several weeks later, so it had to be more or enough [to pay off the loan]." Later in his testimony, though, he admitted that he had the bank credit the amount to pay off his loan.
 {¶ 58} Thereafter, in December 1998, Mr. Simpson took out the additional $10,000 loan using the Viper as collateral. He stated that he did not know that the VIN on the loan paperwork was off by one digit until March 2002, when he tried to use the original, signed paperwork in order to do some title research on the Viper. He denied that the original paperwork had a changed number, or that he intentionally gave the bank the wrong VIN. Mr. Simpson also insisted that he told Meden he was using the Viper to secure the additional loan.
 {¶ 59} Mr. Simpson did not receive any more money from Meden for the Viper. After repeatedly asking Meden for the remainder of the purchase price, Mr. Simpson testified that he first talked to a repossession company in late 1999, November or December. The repossession company told him to keep renewing the tags for Meden so that the car would be on the road and easier to repossess. They also encouraged him to file unauthorized use charges against Meden, which he never did. Mr. Simpson also spoke to Suffles about repossessing the car, and even gave Suffles a copy of the memorandum title.
 {¶ 60} Mr. Simpson then did nothing until around January 2002 because he "got kind of busy." In February or March 2002, Suffles located the Viper, which Mr. Simpson said Meden was hiding. Mr. Simpson then filed for a duplicate memorandum of title to give to a local repossession company who agreed to repossess the Viper on a contingency fee. Suffles still had the original memorandum of title, but for some reason Mr. Simpson decided to use a separate company to repossess the car. He thought that the repossession company was "going to serve * * * a civil [sic.] on [Meden], bring him into court. [The repossession company] said it would only take three days * * * [t]o get a replevish [sic.] warrant."
 {¶ 61} Per Mr. Simpson's testimony, at the same time he was attempting to repossess the car, he also spoke with the bank about his delinquent loan payments. He did not remember the bank telling him at that time that they might repossess the Viper. He did recall Cram visiting his dealership to talk to him, but insisted that another individual also witnessed the entire conversation. He denied telling Cram that the Viper was totaled in Canada.
"Q — You are saying [Cram] got on the stand yesterday and lied?
"A — Exactly. And you can call [this other witness] right now and he was there the whole time[.] * * * I will do a phone call to him right now."
 {¶ 62} Mr. Simpson, though, did not call this witness in his defense.
 {¶ 63} Mr. Simpson also recalled getting a telephone call from Lieutenant Hete about the Viper. He told the Lieutenant that he had a company trying to repossess the car from Meden, and that he still owned the car. He also told Lieutenant Hete that Meden still owed money on the Viper. He claimed to have repeatedly tried to end the conversation, telling the Lieutenant that he had an attorney working with the situation.
 {¶ 64} Mr. Simpson then testified about the taped telephone conversation with Meden and called it his "way of trying to muscle [Meden], or * * * trying to relieve [Meden] some way to get him to just give [Mr. Simpson] that car for a little bit. [Mr. Simpson] used part true story, part false." He said that he spent the entire conversation trying to find out where Meden kept the Viper, and simply wanted Meden to understand that "everything [would] be all right if he just [gave Mr. Simpson] that car." Mr. Simpson wanted to cast the blame for any threat of repossession on Suffles and scare Meden into giving Mr. Simpson the Viper back.
 {¶ 65} Mr. Simpson also insisted that he knew the conversation was being taped. At that point, though, he felt that it did not matter because "we were talking about Norton and not Portage County where [he does his] business out of."
 {¶ 66} He also admitted that he had not returned any money to Meden.
"Q — Have you ever returned any of this money to [Meden]; yes or no?
"A — Returned — spent some of it for him, yeah.
"Q — Did you return any of the money that he gave you to him; yes or no?
"A — [Meden] authorized me to spend it.
"Q — He authorized you to spend his money?
"A — Yes."
 {¶ 67} Mr. Simpson also admitted at trial to entering a no contest plea on passing bad checks to Akron Auto Auction and to pleading guilty three times to falsification regarding temporary vehicle tags. He blamed the falsifications on his failure to use his glasses — he wrote down the wrong number in the wrong column. He also talked about both the numerous financial woes he had suffered, including an accident that destroyed the entire front line of cars at his dealership, and the large purchases he had made, including a number of boats and two airplanes. He even brought pictures of his airplanes to trial.
 {¶ 68} Mr. Simpson also talked at some length about the insurance coverage he kept on the Viper from 1997 to the date of trial. He spoke about a general commercial policy which would cover the Viper if it were part of his inventory. The policy did not specifically list the Viper, though Mr. Simpson insisted that the insurance company did not require specific endorsements for each vehicle. His personal vehicles were individually identified on a separate policy. The Viper was not included.
 {¶ 69} After reviewing the extensive testimony, we find that the convictions for grand theft and an offense involving a motor vehicle title in Summit County in this case were not against the manifest weight of the evidence. The jury clearly chose to believe the testimony of Meden and the State's witnesses. While conflicting evidence was presented at trial, this court will not overturn Mr. Simpson's convictions simply because the jury chose to believe the State's witnesses. State v. Merryman, 9th Dist. No. 02CA008109, 2003-Ohio-4528, at ¶ 28, quoting State v.Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757. A finding that a conviction is supported by the weight of the evidence also includes a finding of sufficiency of the evidence. Smith at ¶ 9, quoting State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462. Accordingly, we find Mr. Simpson's second and third assignments of error to be without merit.
 Fifth Assignment of Error
"The court improperly denied [Mr. Simpson's] motion to dismiss based on the court's lack of venue."
 {¶ 70} In his fifth assignment of error, Mr. Simpson argues that the trial court improperly failed to transfer this case due to lack of venue. He alleges that all transactions which led to the charges against him took place in Portage County, and not Summit County. In the alternative, he asserts that the court improperly denied his motion to quash for improper venue.
 {¶ 71} We first note that Mr. Simpson did not file a motion to transfer the case due to improper venue. Any such motion would actually have been improper under the Criminal Rules. Crim.R. 18(B) permits a transfer of venue only when "`it appears that a fair and impartial trial cannot be held in the court in which the action is pending.'" See State v. Ingram, 9th Dist. No. 21041, 2003-Ohio-357, at ¶ 17, quoting Crim.R. 18(B). Mr. Simpson has never alleged that he could not receive a fair and impartial trial in Summit County.
 {¶ 72} Venue is proper in any county where the offense, or any element of the offense, was committed. R.C. 2901.12(A). While venue is not a material element of an offense, the State must prove venue beyond a reasonable doubt unless it is waived by the defendant. State v. Headley (1983), 6 Ohio St.3d 475, 477, citing State v. Draggo (1981), 65 Ohio St.2d 88, 90. Express evidence establishing venue is not necessary as long as the facts and circumstances of the case show beyond a reasonable doubt that the crime was committed in the county and state named in the indictment. State v. Dickerson (1907), 77 Ohio St. 34, paragraph one of the syllabus; Headley, 6 Ohio St.3d at 477. In other words, in a case where venue is subject to conflicting testimony, the jury must decide whether the prosecution has proven the specific venue beyond a reasonable doubt.
 {¶ 73} Prior to trial, a defendant may raise by motion "any defense, objection, evidentiary issue, or request that is capable of determination without the trial of the general issue." Crim.R. 12(C). However, because venue, as a fact that must be proven beyond a reasonable doubt by the State, is an element that cannot be determined without a trial on the issue, a pretrial motion challenging venue is not appropriate. A defendant may only challenge venue prior to trial if it equates to an actual defect in the indictment — for example, if the indictment failed to allege venue. See Crim.R. 12(C)(2). There is no evidence in the case at bar indicating that the indictment was defective.
 {¶ 74} In such a case, a defendant may only raise the issue of improper venue at trial via a Crim.R. 29 motion for acquittal, and may later appeal that decision, like any jury determination of fact, based on either the sufficiency of the evidence or manifest weight. See State v. Lloyd, 9th Dist. No. 21098, 2003-Ohio-2636, at ¶ 8-15; State v. Watkins, 9th Dist. No. 02CA008087, 2003-Ohio-1308, at ¶ 20-27. Therefore, Mr. Simpson's allegations that the trial court erred in denying his pretrial motion to quash based on improper venue is completely meritless. Absent a defect in the indictment, Mr. Simpson may not challenge venue in that manner. We find no error and overrule Mr. Simpson's fifth assignment of error.
 Fourth Assignment of Error
"[Mr. Simpson's] Sixth (6th) amendment rights were violated as he received ineffective assistance of counsel."
 {¶ 75} In his fourth assignment of error, Mr. Simpson asserts that he received ineffective assistance of counsel at trial. He points to three specific things below which he argues amounted to ineffective assistance: (1) failure of counsel to file a pretrial motion to dismiss on the basis that R.C. 2921.331(B) was unconstitutional due to "inconsistencies of statute;" (2) failure of counsel to file a motion for severance of the grand theft charge and the offense involving motor vehicle charge; and (3) failure of counsel to challenge venue prior to trial.
 {¶ 76} In evaluating an ineffective assistance of counsel claim, this Court employs a two step process as described inStrickland v. Washington (1984), 466 U.S. 668, 687,80 L.Ed.2d 674. First, the court must determine whether there was a "substantial violation of any of defense counsel's essential duties to his client." State v. Bradley (1989),42 Ohio St.3d 136, 141, quoting State v. Lytle (1976), 48 Ohio St.2d 391,396. Licensed attorneys are presumed competent in Ohio. Lytle,48 Ohio St.2d at 397. A defendant must overcome the "presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Strickland, 466 U.S. at 689, quoting Michel v. Louisiana (1955), 350 U.S. 91, 101,100 L.Ed. 83.
 {¶ 77} Second, the court must determine if prejudice resulted to the defendant from counsel's ineffectiveness. Bradley,42 Ohio St.3d at 141-42, quoting Lytle, 48 Ohio St.2d at 396-397. Prejudice exists where the trial result would have been different but for the alleged deficiencies of counsel. Bradley,42 Ohio St.3d 136 at paragraph three of the syllabus. In this case, Mr. Simpson bears the burden of proof, and must show that "`counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable.'" State v. Colon, 9th Dist. No. 20949, 2002-Ohio-3985, at ¶ 48, quoting Strickland,466 U.S. at 687.
 {¶ 78} This Court need not address each element in any particular order — if we find there was no prejudice to Mr. Simpson by defense counsel's acts, we need not address whether defense counsel's acts were actually deficient. See Bradley,42 Ohio St.3d at 143. In fact, the Ohio Supreme Court has instructed that "`[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice * * * that course should be followed.'" Id., quoting Strickland, 466 U.S. at 697. In this case, we find that there was not sufficient prejudice to Mr. Simpson to support a claim of ineffective assistance of counsel.
 {¶ 79} As to Mr. Simpson's first claimed error, we note that R.C. 2921.331(B) is irrelevant to this case. The statute deals with the failure of an individual to comply with the order or signal of a police officer. It does not apply to the case at bar.
 {¶ 80} Mr. Simpson's second alleged error involved the failure of counsel to file a motion of severance below. He does not set forth any basis for severance below, and failed to demonstrate any prejudice resulting from the lack of severance. He relies on alleged inconsistencies in Meden's testimony. The jury, obviously, found credibility in that testimony.
 {¶ 81} Finally, the correct mechanism to challenge venue in this case is not a pretrial motion to dismiss. As noted before, the only manner in which Mr. Simpson could challenge venue, unless there was a defect in the indictment, would be via a Crim.R. 29 motion for acquittal at trial followed by a manifest weight or sufficiency of the evidence challenge on appeal. Because a pretrial motion to challenge venue would be improper in this case, Mr. Simpson could not have been prejudiced by his counsel's failure to file that motion. We overrule Mr. Simpson's fourth assignment of error.
 III. {¶ 82} Mr. Simpson's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.
Baird, P.J. and Carr, J., concur.